UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOYCE PETERS,

                         Plaintiff,                **MEMORANDUM & ORDER**
                                                07-CV-2553 (DRH) (ETB)

        - against -

MOLLOY COLLEGE OF ROCKVILLE CENTRE,
SUSAN VITALE in her official and individual
capacities, DOLORES PARRY in her official and
individual capacities, JEANNINE MULDOON in
her official and individual capacities, and RICHARD
SCHURE in his official and individual capacities,[1]

                        Defendants.
-------------------------------------------------------------X

**A P P E A R A N C E S :**

**For the Plaintiff:**
**LAW OFFICES OF FREDERICK K. BREWINGTON**
50 Clinton Street, Suite 501
Hempstead, New York 11550
By:  Frederick K. Brewington, Esq.
     Valerie M. Cartright, Esq.

**For the Defendants:**
**HARRINGTON, OCKO, & MONK, LLP**
81 Main Street, Suite 215
White Plains, New York, 10601
By:  Kevin J. Harrington, Esq.

**HURLEY, Senior District Judge:**

            Plaintiff Joyce Peters ("Plaintiff") commenced this action against defendants

Molloy College of Rockville Centre ("Molloy"), Susan Vitale ("Vitale"), Dolores Parry

("Parry"), and Jeannine Muldoon ("Muldoon") (collectively, "Defendants"), asserting federal

causes of action pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title

---

[1] Plaintiff withdrew her claims against defendant Richard Schure on April 16, 2008.

VI"), 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1985 ("Section 1985"), 42 U.S.C. § 1986

("Section 1986"), a state law cause of action pursuant to New York State Human Rights Law,

N.Y. Exec. Law ("NYSHRL") § 296, and state law causes of action for breach of contract and

defamation.[2]  Plaintiff alleges that she was discriminated against based on her race and in

retaliation for her complaints of race discrimination.  Defendants have moved for summary

judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.  For the reasons that follow,

Defendants' motion is granted.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1

Statements, are undisputed unless otherwise noted.  Molloy is an independent and fully

accredited college located in Rockville Centre, New York.  (Defs.' R. 56.1 Stmt. ¶ 1.)  Plaintiff is

an African-American female who applied for admission to Molloy's graduate nursing program.

(Compl. ¶¶ 6, 13.) Vitale is a professor at Molloy, Parry is the Associate Dean for Academic

Support Services, and Muldoon is the Associate Dean of the Graduate Nursing Program.  (*Id.* ¶¶

8-10.)

I.      *Molloy's Graduate Nursing Program and NUR 555*

Molloy's graduate nursing program required students to take certain core courses

---

[2] Plaintiff's Title VI race discrimination and retaliation claims, Section 1981, and breach of contract claims
were dismissed against the individual defendants in their individual capacities on July 8, 2008.  Additionally,
Plaintiff's Section 1985 and Section 1986 claims were dismissed on July 8, 2008 in their entirety.  Upon this motion,
Plaintiff has voluntarily withdrawn her Title VI race discrimination claim as against the individual defendants in
their official capacities (Pl.'s Mem. at 2) and defamation claim as against all Defendants (Pl.'s Mem. at 17).  Thus,
the remaining claims that will be addressed by the Court are Plaintiff's Title VI retaliation, Section 1981, and breach
of contract claims as against Molloy and the individual defendants in their official capacities, NYSHRL claim as
against all Defendants, and Title VI race discrimination claim as against only Molloy.

in order to graduate, including a minimum of two research courses.  One such requisite research course was entitled *Research, Method and Design* ("NUR 555").  NUR 555 required students to develop individual research proposals.  (Defs.' R. 56.1 Stmt. ¶ 11.)

Molloy College's Graduate and Post-Graduate Nursing Handbook ("Nursing Department Graduate Handbook") provided that "[e]very member of the academic community ha[d] a duty neither to cheat nor to condone cheating, fabrication, plagiarism, or facilitation of academic dishonesty" and that "[a]cademic infractions [we]re subject to disciplinary action." (*Id.* ¶ 14; Decl. of John T.A. Rosenthal in Supp. of Defs.' Mot. For Summ. J. ("Rosenthal Decl."), Ex. I ("Nursing Department Graduate Handbook") at 23.)

The Nursing Department Graduate Handbook set forth the graduate nursing department's policies.  One such policy was the requirement that the students "use the format of the <u>Publication</u> <u>Manual</u> <u>of</u> <u>the</u> <u>American</u> <u>Psychological</u> <u>Association</u> [("APA Manual")] for all assigned written material in the Master's Program."  (Defs.' R. 56.1 Stmt. ¶ 25; Rosenthal Decl., Ex. I at 30.)  The Nursing Department Graduate Handbook also contained a policy regarding plagiarism, to wit:

> Plagiarism is the presentation of another's writing or another's ideas from the literature as one's own.  Legally, socially and academically it is considered a form of theft and usually results in automatic failure on the paper or in the course and may result in an inability to repeat the course. Students who have plagiarized may be referred to the Director of the Graduate Program and/or the Chairperson of the Nursing Department. Repeated plagiarism may result in dismissal from the college . . . .

(Rosenthal Decl., Ex. I at 32.)  While Plaintiff was a student in the graduate nursing program, she was provided with, and read, a copy of the Nursing Department Graduate Handbook.  (Defs.' R.

56.1 Stmt. ¶ 29.)  Plaintiff was also familiar with the APA Manual.  (*Id.* ¶ 30.)

NUR 555's course syllabus similarly provided that "[a]ny papers that contain[ed] direct quotes or paraphrasing without citation [would] be graded 'F'," and that students were expected to "[r]eview the [Nursing Department Graduate Handbook] and Molloy College Graduate Handbook and Calendar" and "comply with the Molloy College Academic Integrity Policy."  (*Id.* ¶ 45; Rosenthal Decl., Ex. N)   The syllabus furthermore provided that the students' work would be validated using Turnitin.com, as well as other college resources.  (Defs.' R. 56.1 Stmt. ¶ 46; Rosenthal Decl., Ex. N)

**II.**     *Molloy's College-Wide Grade Appeal Process and Due Process Procedure Regarding Academic Infractions*

Molloy utilized a college-wide grade appeal process that was accepted by the Student Senate in April 1983.  (Defs.' R. 56.1 Stmt. ¶ 7.)  Defendants characterize the grade appeal process as requiring a student to "<u>first</u> confer with the course instructor, and then with the department chairperson."  (*Id*.)  Defendants also claim that if neither the course instructor nor department chairperson was available, the student should then have notified the Associate Dean for Academic Support Services to make arrangements for a meeting with those individuals.  (*Id.*) Plaintiff claims that there was no provision in the college-wide grade appeal policy that "specifically disallow[ed] or preclude[d] legal counsel from participating in the process."  (Pl.'s R. 56.1 Counterstmt. ¶ 10.)  Plaintiff also claims that there was no provision in the college-wide grade appeal policy which required a student to complete the internal graduate nursing appeal process before commencing the college-wide grade appeal policy.  (*Id.*)

Molloy also utilized a due process procedure which specified that certain

4

academic infractions, including cheating, fabrication and plagiarism, were subject to disciplinary action.  (Defs.' R. 56.1 Stmt. ¶ 7.)  Defendants, citing to Molloy's College Student Handbook and Campus Life Calendar published and issued for the 2006-2007 term (Rosenthal Decl., Ex. H at 95), claim that Molloy's due process procedure required students, faculty and administrators to attempt to resolve potential academic infractions through an informal consultation with the Associate Dean for Academic Support Services.  (Defs.' R. 56.1 Stmt. ¶ 6.)  While Defendants claim that students were not permitted to have legal counsel or a witness present during the informal consultation (*id.*), Plaintiff claims that the Due Process procedure did not "specifically preclude a student form having legal counsel, or a witness, present during the informal consultation."  (Pl.'s R. 56.1 Counterstmt. ¶ 7.)  Defendants also claim that if the informal consultation process did not result in a resolution of the matter, a student would be permitted to initiate a formal proceeding, provided that a written charge was filed against the student on a form provided by the Associate Dean for Academic Support Services.  (Defs.' R. 56.1 Stmt. ¶ 6.) Defendants contend that the student would be notified in writing by the Associate Dean for Academic Support Services of the written charge within 14 days of its filing and that the student would then have 14 days to answer the charges.  (*Id.*)  Plaintiff disputes Defendants' claim that there were no exceptions to a student following the aforementioned procedure and claims that "[t]here have been prior instances at Molloy College wherein Molloy College has made exceptions to its policies and procedures."  (Pl.'s R. 56.1 Counterstmt. ¶¶ 7, 8.)

### III.  *Molloy's Graduate Nursing Program's Grade Appeal Process and Policies Regarding Academic Problems*

Although Plaintiff disagrees with Defendants' claim that Molloy's graduate

nursing program utilized its own grade appeal process in addition to Molloy's college-wide grade appeal process, Plaintiff agrees that Molloy's graduate nursing program provided a written grade appeal process in which "[a] student who ha[d] a question or issue regarding grading, initiate[d] the Academic Review Process." (Defs.' R. 56.1 Stmt. ¶¶ 15, 16; Rosenthal Decl., Ex. I at 24.) Defendant claims that a student was required to first attempt to resolve academic issues with the faculty concerned before having the option to meet with the faculty and program director as a second step in the resolution process. (Defs.' R. 56.1 Stmt. ¶ 17.) Plaintiff, on the other hand, while agreeing that there were two steps to the informal process, disputes that a student was required to first meet with the faculty concerned. (*Id.*) Both parties agree that a student could not have a witness present during the informal stage of the process. (*Id.*)

Defendants also claim that if the second stage's meeting between the student, faculty and program director did not result in a resolution of the matter, the student had the option of moving to the third stage, which was the formal process. (*Id.* ¶ 18.) Defendants claim that the formal process required the student to tender a completed academic review form to the Nursing Department's Chairperson, and have a formal meeting with the Program Director, Nursing Department's Chairperson, faculty, and a non-legal support person chosen by the student. (*Id.*) According to Defendants, if the formal process did not produce a satisfactory outcome, the student could implement the Molloy College Grade Appeal Process. (*Id.* ¶ 19.) Defendants contend that the Graduate Nursing Handbook directed students to the Molloy College Undergraduate/Graduate Student Handbook and Calendar for a description of the grade appeal process. (Defs.' R. 56.1 Stmt. ¶ 19.) Finally, Defendants claim that a student was required to complete the graduate nursing department's internal appeal process before

commencing Molloy's College Grade Appeal Process. (*Id.* ¶ 20.) The Nursing Department

Graduate Handbook stated that it was "the responsibility of the student to obtain the instructions

and to observe the deadlines for filing an appeal." (*Id.*)

The Nursing Department Graduate Handbook also provided steps for the

resolution of academic problems. (*Id.* ¶ 24.) It specifically stated:

> [F]or resolution of academic problems, the sequential steps listed here are
> to be followed: (1) make an appointment with individual instructor to
> discuss problem; (2) make an appointment with the Director of the
> graduate program and then, if necessary or desired, with the Chairperson
> of the Nursing Department to discuss the problem; (3) make an
> appointment with the Vice President for Academic Affairs to discuss the
> problem.

(*Id.*; Rosenthal Decl., Ex. I at 26.) The policies did not permit a student to arbitrarily and

unilaterally avoid those requirements. (Defs.' R. 56.1 Stmt. ¶ 24.)

## IV. *Pattern of Discrimination/Dr. Frieda Pemberton*

Plaintiff alleges that the Defendants engaged in a pattern of racial discrimination.

(Compl. ¶ 2.) Specifically, Plaintiff alleges that she learned that Caucasians and other students

were being judged and graded differently from Plaintiff, and that African-American graduate

nursing students had been complaining that their papers were being graded and evaluated more

harshly than those of Caucasian students. (*Id.* ¶ 20, 63)

In addition, Plaintiff claims that she became aware of attempts by Molloy

Professor Teresa Aprigliano ("Aprigliano") to undermine and question the competency of an

African-American professor at Molloy, Dr. Freida Pemberton ("Pemberton"), and that on April

26, 2006, Plaintiff prepared a letter to Molloy's President, Drew Bogner ("Bogner"), which

described statements made by Aprigliano.  (*Id.* ¶¶ 60, 61.)  Although Defendants claim that the draft letter prepared by Plaintiff did not contain any mention of racial discrimination against Plaintiff or anyone else at Molloy by the Defendants (Defs.' R. 56.1 Stmt. ¶ 36), Plaintiff argues that her letter "voiced her concern over the discriminatory actions of Dr. Aprigliano."  (Pl.'s R. 56.1 Counterstmt. ¶ 16.)

Plaintiff emailed an unsigned draft of the letter to Molloy Professor Freida Pemberton.  (Defs.' R. 56.1 Stmt. ¶ 37.)  Despite the fact that the Complaint alleges that "Plaintiff addressed a letter, by email" to Bogner (Compl. ¶ 61), Plaintiff now agrees that she did not email the letter to President Bogner.  (Defs.' R. 56.1 Stmt. ¶ 41.)  While Defendants claim that Bogner never received the letter in the mail and that, after she commenced the instant litigation, Plaintiff destroyed her personal computer on which the letter was drafted, Plaintiff disputes having destroyed her personal computer in May 2008, and claims that she mailed rather than emailed the letter to President Bogner.  (*Id.* ¶¶ 38, 39; Pl.'s R. 56.1 Counterstmt. ¶ 17.)

Plaintiff claims that Pemberton was involved in another situation in which a student lodged false allegations against Pemberton.  (Compl. ¶¶ 69-72.)  Specifically, Plaintiff claims that Pemberton had a dispute with the student, who had failed to obtain a required signed contract to establish her clinical practice requirement, and that after the student complained, she was removed from Pemberton's class and placed in a class by herself with Muldoon, who accepted her unsigned contract.  (*Id.*)

## V.  *Plaintiff's Failure to Graduate*

The parties state that during the Fall Semester of 2006, Plaintiff was enrolled in NUR 555, which was being taught by Vitale and which was the final course requirement for

Plaintiff to obtain her Master's Degree. (Defs.' R. 56.1 Stmt. ¶ 42; Pl.'s R. 56.1 Counterstmt. ¶¶ 19, 20.) The students in NUR 555 were required to complete five assignments over the course of the semester. (Compl. ¶ 21.) Plaintiff scored 5 out of 5 on the first assignment, 15 out of 15 on the second and third assignments, and 12 out of 15 on the fourth assignment. (*Id.*) The fifth and final assignment, a research proposal, counted as 40% of the course grade. (*Id.* ¶ 22.) Plaintiff claims that the final assignment "called for very subjective evaluation and . . . was vague and general," and that Vitale "failed to provide the students in her class with a Rubric or objective grading criteria." (Pl.'s R. 56.1 Counterstmt. ¶ 23.) Further, Plaintiff claims that Vitale told her and other students "that the proposal should be drafted as if they were conducting research." (*Id.* ¶ 30.)

Prior to the scheduled submission date, Plaintiff sent an email to Vitale describing the subject matter of her final research proposal. (Defs.' R. 56.1 Stmt. ¶ 48.) Thereafter, on or about December 4, 2006, Plaintiff sent another email to Vitale submitting her final research proposal for the course. (*Id.* ¶ 49.) Plaintiff's research proposal involved the study and comparison of treatments for diabetes. (*Id.* ¶ 55.)

Defendants claim that Plaintiff's final research proposal paper contained clear indicia of plagiarism, and that it contained direct quotations from previously published papers which violated the APA Manual's format for proper citation and quotation. (*Id.* ¶ 50.) Defendants also assert that whereas the final research paper was supposed to be a proposal for a study, Plaintiff's paper reflected a fully conducted study, with references to a data collection process, a grant to conduct the study, demographic backgrounds for the participants, statistical analysis and results. (*Id.* ¶ 58.) Defendants additionally claim that the fundamental aspects of

Plaintiff's final research proposal were "<u>exactly</u> <u>the</u> <u>same</u>" as those of an "already existing[,] published research study conducted by a group of physician[s] and medical researchers under the auspices of IDEATEL, and published by Dr. Kaufman in 2006." (*Id.* ¶ 56.)

Plaintiff admits that she cited Dr. Kaufman's article several times in her research proposal, but states that the Kaufman "article . . . was not about the IDEATel Project but apparently referenced that project." (Defs.' R. 56.1 Stmt. ¶ 57; Pl.'s R. 56.1 Counterstmt. ¶ 45.) Plaintiff claims that she "prepared the proposal in accordance with Professor Vitale's instruction." (Id. ¶ 31.) In addition, Plaintiff claims that NUR 555's students raised numerous questions in class as to how to structure the proposal and what was to be included, and that Vitale provided conflicting information and direction in response. (Pl.'s R. 56.1 Counterstmt. ¶¶ 24, 25.) Plaintiff also claims that no individual meetings were scheduled with Vitale to discuss questions. (*Id.* ¶ 24.)

On December 11, 2006, Vitale met with Plaintiff to discuss Plaintiff's final research proposal paper. (Defs.' R. 56.1 Stmt. ¶ 64.) At that time, Vitale and Plaintiff had a discussion regarding whether Plaintiff could submit a second paper for grading. (*Id.* ¶ 66.) While Plaintiff claims that she was told she should submit a second paper for grading (Compl. ¶ 28), Vitale claims she advised Plaintiff, *inter alia*, that she would have to check whether submission of a second paper would be permissible since it would not be in compliance with course and school policy. (Defs.' R. 56.1 Stmt. ¶ 66.) That same day, Vitale emailed a copy of Plaintiff's final research proposal to Muldoon. (*Id.* ¶ 62.)

Defendants assert that on or about December 12, 2006, Vitale received results from Turnitin.com pertaining to an analysis of Plaintiff's final research proposal paper. (*Id.* ¶

69.) According to Defendants, "the Turnitin.com originality report provided an overall similarity index with respect to Plaintiff's final research proposal paper of 19%." (*Id.*) On or about December 13, 2006, Vitale provided a copy of the report to Muldoon. (*Id.* ¶ 70.) Vitale told Muldoon "that she had a discussion with [Plaintiff] about . . . the fictionalized study results" that were contained in Plaintiff's final research proposal, and that Plaintiff had stated that the "research proposal was of her own creation, and that [she] had not heard of IDEATEL." (*Id.*)

On or about December 14, 2006, Plaintiff attempted to submit a revised research proposal. (Defs.' R. 56.1 Stmt. ¶ 71.) Vitale informed Muldoon about Plaintiff's attempted re-submission. (*Id.* ¶ 74.) Vitale also informed Muldoon that she had not guaranteed Plaintiff that a resubmission would be accepted. (*Id.*) Later that day, Vitale notified Plaintiff that her final research proposal did not pass the course's requirements. (*Id.* ¶ 75.) Vitale further informed Plaintiff that Muldoon had reviewed Plaintiff's final research proposal and was aware that it did not meet passing requirements. (*Id.*) Vitale offered to meet with Plaintiff to discuss why the paper did not meet course requirements. (*Id.*) Plaintiff responded the next day that she did not understand why her proposal did not satisfy the course's passing requirements. (Defs.' R. 56.1 Stmt. ¶ 76.)

After having been initially informed by Vitale that Plaintiff was suspected of plagiarizing her final research proposal paper, Muldoon contacted a former colleague and, without disclosing Plaintiff's identity, provided her former colleague with certain basic information regarding the content of Plaintiff's research proposal. (*Id.* ¶ 77.) On or about December 14, 2006, Muldoon's former colleague responded to Muldoon and indicated that the research proposal "sounded very similar to the IDEATEL study" and that "several

interdisciplinary papers had been published by some of IDEATEL's main investigators." (*Id.* ¶ 78.)

Plaintiff met with Vitale and Muldoon on December 18, 2006. (*Id.* ¶ 82.) During that meeting, Plaintiff stated "that she was <u>not</u> <u>familiar</u> with IDEATEL." (*Id.* ¶ 83.) Even after Muldoon pointed out that Plaintiff had cited to the IDEATEL study in her research proposal paper, Plaintiff maintained that she was not familiar with the IDEATEL study. (Defs.' R. 56.1 Stmt. ¶ 83.) Plaintiff, Vitale and Muldoon also discussed whether Plaintiff had understood the assignment. (*Id.* ¶ 84.)

Prior to meeting with Vitale and Muldoon, Plaintiff had asked a fellow student, Christine Brooks ("Brooks"), to attend the meeting too. (*Id.* ¶ 86.) However, Brooks was ultimately not permitted to attend the informal meeting between Plaintiff, Vitale and Muldoon pursuant to Molloy's College policies and Graduate School of Nursing policies. (*Id.* ¶ 88.) Plaintiff spoke with Brooks after her meeting with Vitale and Muldoon. (*Id.*) Brooks indicated that she had no recollection of Plaintiff mentioning any racial discrimination by Vitale or Muldoon against Plaintiff or Plaintiff ever mentioning that Vitale and Muldoon were retaliating against Plaintiff. (*Id.*)

On December 19, 2006, Plaintiff submitted a request to file a grade appeal for her final research proposal grade. (Defs.' R. 56.1 Stmt. ¶ 89.) However, Defendants claim that Plaintiff's grade appeal was premature because she had not submitted an academic review form to the Chairperson of the Nursing Department nor had she scheduled or attended a formal meeting with the Program Director, Department Chairperson, or faculty member at issue. (*Id.* ¶

90.)  Defendants also claim that Plaintiff's grade appeal did not contain any mention of "racial discrimination or retaliation <u>against</u> <u>anyone</u> at Molloy."  (*Id.* ¶ 89.)

On or about December 20, 2006, Vitale submitted a complaint form to Parry's office about Plaintiff's possible academic infractions.  (Defs.' R. 56.1 Stmt. ¶ 91.)  Plaintiff states that on or about January 8, 2007, she received a notice from Molloy informing her that her graduation had been denied.  (Pl.'s R. 56.1 Counterstmt. ¶ 82.)  Plaintiff scheduled a meeting with Parry for January 11, 2007.  (Defs.' R. 56.1 Stmt. ¶ 94.)  Plaintiff appeared for the meeting with her counsel, Frederick K. Brewington ("Brewington"), but she was advised that the meeting could not take place with her counsel present.  (*Id.* ¶ 95.)  On or about the same day, January 11, 2007, Parry provided a letter to Plaintiff's counsel, Brewington, regarding the procedures at Molloy to address academic infractions and grade appeals.  (*Id.* ¶ 96.)  Again, on or about that same day, Brewington wrote back to Richard J. Schure, counsel for Molloy.  (*Id.*)

On or about January 30, 2007, pursuant to the requirements of Molloy's Student Handbook regarding the informal consultation process, Parry wrote a letter to Plaintiff, through Molloy's counsel, informing her of her academic infractions.  (Defs.' R. 56.1 Stmt. ¶ 98; Pl.'s R. 56.1 Counterstmt. ¶ 91.)  The letter described Plaintiff's options to remediate the issue of the possible plagiarism, including participation in the Big MITT Program, and indicated that Plaintiff could continue the grade appeal process or retake the course under particular guidelines.  (Defs.' R. 56.1 Stmt. ¶ 98; Pl.'s R. 56.1 Counterstmt. ¶ 92.)  Plaintiff claims these options were offered to her without her having first been heard on the appeal and complaint, in violation of Molloy's policies and procedures.  (Pl.'s R. 56.1 Counterstmt. ¶ 92.)  Defendants allege that Plaintiff "<u>never</u> completed the informal grade appeal or academic integrity resolution processes

required under the dictates of the Molloy College Student Handbook" nor the "informal or formal grade appeal or academic infraction process[es] required by the Molloy College Graduate Nursing Program."  (Defs.' R. 56.1 Stmt. ¶¶ 99, 100.)

Plaintiff claims that on February 1, 2007, she received a notice from Molloy's Registrar notifying her that she had not met the requirements for NUR 555, and that the next day, counsel for Molloy sent a memorandum to her attorney suggesting that she communicate with Parry to complete the process.  (Pl.'s R. 56.1 Counterstmt. ¶¶ 95, 96.)  Plaintiff further alleges that she twice indicated to Molloy's counsel that she was interested in going forward with the process, but that Plaintiff did not receive any response.  (*Id.* ¶¶ 97, 99.)  Thus, Plaintiff argues, she made every effort to resolve the matter through the informal process but her efforts were ignored.  (*Id.* ¶ 102.)  Additionally, Plaintiff claims that she did not receive written notification of any charges that had been filed against her, and that Defendants violated their own procedures by failing to file charges, serve notification of any charges on Plaintiff, or permit Plaintiff time to answer any charges or appear before a Judicial Committee.  (*Id.* ¶¶ 103-05.)

Plaintiff filed this action alleging that Defendants wrongfully deprived her of a Master's Degree through acts and a pattern of discrimination based upon race, and in retaliation for her complaints of race discrimination.

## DISCUSSION

### I.    *Applicable Law and Legal Standards*

#### A.    *General Summary Judgment Standards*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other

documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of N.Y.*, 224 F.3d 149, 157 (2d. Cir. 2000), and should thus be granted with caution in discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.*

"When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

**B.** **Summary Judgment in Racial Discrimination Cases**

"When deciding motions for summary judgment in racial discrimination cases such as that presented here, courts apply the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.E.2d 668 (1973)." *Jacques v. Adelphi Univ.*, 2011 WL 6709443, at *2 (E.D.N.Y. Dec. 19, 2011).

Under *McDonnell Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's actions; if the defendant does so, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's stated reason is merely pretext for discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Koumantaros v. City Univ. of N.Y.*, 2007 WL 840115, at *7 (S.D.N.Y. March 19, 2007). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

## II. Plaintiff Fails to Raise a Genuine Issue of Material Fact as to Her Claim of Intentional Discrimination Under Title VI

### A. Governing Legal Principles

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In order to establish a viable claim under Title VI, the defendant must be a recipient of federal funding. *Tripp v. Long Island Univ.*, 48 F. Supp. 2d 220, 226 (E.D.N.Y.), *aff'd*, 201 F.3d 432 (2d Cir. 1999); *see generally Soberal-Perez v. Heckler*, 717 F.2d 36, 38 (2d Cir. 1983) ("Title VI . . . was meant to cover only those situations where federal funding is given to a non-federal entity which, in turn, provides financial assistance to the ultimate beneficiary.").

To make out a claim of intentional discrimination under Title VI, the claimant must show "that the defendant[s] discriminated against [her] on the basis of race, that the discrimination was intentional,[3] and that the discrimination was a substantial or motivating factor for the defendant[s'] actions." *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (internal citations and quotation marks omitted); *see also Lopez v. Bay Shore Union Free Sch. Dist.*, 668 F. Supp. 2d 406, 413-14 (E.D.N.Y. 2009) (stating that these factors are required for "establish[ing] a claim under either Title VI or Section 1981").

Plaintiff may make a *prima facie* case of discriminatory intent by using either direct evidence or circumstantial evidence. *Koumantaros*, 2007 WL 840115, at *8. Courts

---

[3] *See Alexander v. Sandoval*, 532 U.S. 275 (2001) (holding that there is no private right of action to enforce disparate-impact regulations under Title VI).

recognize that universities, "like employers, rarely leave a 'smoking gun' or 'paper trail' identifying a discriminatory procedure." *Davis v. Halpern*, 768 F. Supp. 968, 982 (E.D.N.Y. 1991). Therefore, in the absence of direct evidence, a claimant may make a *prima facie* case of racial discrimination under Title VI with circumstantial evidence showing that: "(1) she is a member of a protected class; (2) she suffered an adverse action in pursuit of her education by defendant; (3) she was treated differently from similarly situated students who are not members of the protected class; and (4) she was qualified to continue in her educational pursuit." *Koumantaros*, 2007 WL 840115, at *8 (citing *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003)); *see also J.E. ex rel. Edwards v. Center Moriches Union Free Sch. Dist.*, 898 F. Supp. 2d 516, 557 (E.D.N.Y. 2012); *Jacques*, 2011 WL 6709443, at *3.

### B.  Sufficiency of the Evidence

Plaintiff has voluntarily withdrawn her Title VI claims against Vitale, Parry and Muldoon (Pl.'s Mem. at 2); therefore, only Plaintiff's Title VI claims against Molloy will be addressed by the Court.

Plaintiff has satisfied the first two elements of a *prima facie* case of discrimination, i.e., Plaintiff is a member of a protected class because she is African American, and she has suffered an adverse action in pursuit of her education as a result of receiving a failing grade in NUR 555 and being denied graduation and conferral of a Master's Degree. Thus, the Court need only address whether Plaintiff was treated differently from similarly situated students who were not members of the protected class, and whether she was qualified to continue in her educational pursuit.

The proof underscored by Plaintiff gives rise to a material issue of fact as to

19

whether Plaintiff was treated differently from similarly situated non-African American students. Plaintiff has submitted evidence that Molloy granted an exception to its policies and procedures for a non-minority graduate nursing student.  Specifically, Plaintiff has proffered evidence of the deposition testimony of Pemberton, in which Pemberton testified that Molloy permitted a Caucasian graduate nursing student, Jeanette Bredes ("Bredes"), the opportunity to receive credit for clinical hours she completed despite the fact that she failed to fully execute a contract relating to her clinical placement prior to commencing her clinic, as was required by the course policy. [4] (Decl. of Frederick K. Brewington in Opp. to Defs.' Mot. For Summ. J., Ex. HHH at 81-89.) Additionally, Pemberton testified that Muldoon removed Bredes from Pemberton's class to teach Bredes herself, in a single student class setting (*id.* at 95-96), and that Molloy did not adhere to its grade appeal process by mandating that Pemberton attend her meeting with Bredes with Muldoon present, in Muldoon's office, even though the first step of the appeal process should have entailed a meeting between only Bredes and Pemberton. (*Id.* at 89-92.)  Thus, because the evidence indicates that Molloy did not adhere to its requirements, policies and procedures for Bredes, particularly its policy regarding the grade appeal process, but required adherence to its course requirements, policies and procedures, including the grade appeal process, in Plaintiff's case, Plaintiff has proffered sufficient evidence to create a material issue of fact that she was treated differently from similarly situated non-African American students.

The Court next addresses whether Plaintiff was qualified to continue in her

---

[4] The Court notes that Plaintiff's evidence regarding nursing student Bredes is the only evidence produced by Plaintiff which creates an inference of discrimination.  The other testimony submitted by Plaintiff in support of her claim of intentional discrimination consists merely of conjecture or hearsay, or is otherwise insufficient to support Plaintiff's claim.

educational pursuit. The Court is cognizant that, ordinarily, "such a determination is best left [to the] educators themselves." *Koumantaros*, 2007 WL 840115, at * 8, n 12. Nonetheless, under the specific facts of this case, the Court determines that Plaintiff was qualified to continue in her educational pursuit. The record evidences that other than the failing grade Plaintiff received in NUR 555, the very grade at issue in this case, Plaintiff had maintained a 3.86 grade point average during her first two years of the graduate nursing program, and received the following scores on her first four assignments in NUR 555: 5 out of 5 on the first assignment, 15 out of 15 on the second and third assignments, and 12 out of 15 on the fourth assignment. As such, Plaintiff's academic history in Molloy's graduate nursing program indicates that she was qualified to continue in her educational pursuits.

Nevertheless, while Plaintiff has satisfied the *prima facie* standard, Molloy has articulated legitimate, non-discriminatory reasons for its actions, namely, that Plaintiff failed NUR 555 because she submitted a final research proposal paper that did not satisfy explicit course criteria and contained indicia of plagiarism, and that she failed to abide by Molloy's grade appeal and due process procedures and policies. Therefore, the burden shifts back to Plaintiff to prove that Molloy's stated reasons are merely pretext for discrimination. *See J.E. ex rel. Edwards*, 898 F. Supp. 2d at 557. However, Plaintiff has not presented any argument that Molloy's proffered reasons are pretextual, and the Court finds that the record does not support a finding of pretext.

The fact that Plaintiff has only proffered evidence of a single instance which might support an inference of discrimination, coupled with the evidence that Plaintiff's final

research proposal paper contained a certain degree of plagiarism, that Defendants made multiple efforts to verify that Plaintiff's paper contained plagiarism, and that Plaintiff's research proposal paper represented a completed study, including fabricated data and statistical analysis, rather than the required proposed study, supports Defendants' explanation and belies a rational inference of discrimination. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) ("[T]he question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination"). Moreover, any pretext argument is undermined by the fact that Plaintiff received four high grades from Vitale in NUR 555 prior to receiving the failing grade on her final research proposal paper. The Court therefore finds that summary judgment should be granted to Molloy on Plaintiff's Title VI intentional discrimination claim.[5]

### III. Plaintiff Fails to Raise a Genuine Issue of Material Fact as to Her Claim of Retaliation under Title VI

#### A. Governing Legal Principles

To state a *prima facie* case of retaliation under Title VI, "Plaintiff must show: (1) 'participation in a protected activity known to the defendants; (2) adverse action by the defendants against the plaintiff; and (3) a causal connection between the plaintiff's protect[ed] activity and defendants' adverse action.'" *Simpson ex rel. Simpson v. Uniondale Union Free Sch. Dist.*, 702 F. Supp. 2d 122, 134 (E.D.N.Y. 2010) (quoting *McKie v. N.Y. Univ.*, 2000 WL 1521200, at *3 (S.D.N.Y. Oct. 13, 2000)). "An 'adverse action' is sufficiently material to

---

[5] The parties agree that Plaintiff must produce evidence that Molloy had actual knowledge of discrimination in order for Plaintiff to succeed on her claim of intentional discrimination pursuant to Title VI. However, since the Court finds that Plaintiff has not proffered evidence that Molloy's nondiscriminatory reasons are pretext, nor does the record support such a finding, the Court need not address the issue of notice.

sustain a retaliation claim when that action 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Williams v. City Univ. of N.Y., Brooklyn Coll.*, 2011 WL 6934755, at \*6 (E.D.N.Y. Dec. 30, 2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006)). Furthermore, a causal connection may be shown indirectly, through "evidence of temporal proximity between the protected activity and adverse action, or through other evidence such as different treatment of similarly situated students," or directly, "'through evidence of retaliatory animus directed against [the] plaintiff by the defendant.'" *Koumantaros*, 2007 WL 840115, at \* 10 (quoting *Commodari v. Long Island Univ.*, 89 F. Supp. 2d 353, 376 (E.D.N.Y. 2000), *aff'd*, 62 F. App'x. 28 (2d Cir. 2003)).

**B.** **_Sufficiency of the Evidence_**

Viewing the evidence in a light most favorable to Plaintiff, the Court nonetheless concludes that Plaintiff has failed to produce sufficient evidence that she engaged in a protected activity. The only evidence Plaintiff has proffered of allegedly engaging in a protected activity is Plaintiff's act of addressing a letter to Molloy's President, Bogner, to "voice[] her concern over the clearly discriminatory actions of Dr. Aprigliano in seemingly 'seeking negative information on which to report about Dr. Pemberton.'" (Pl.'s Mem. at 10-11.) However, Defendants argue that "a simple review of the letter Plaintiff claims that she sent establishes that nothing in the letter <u>implies</u> or <u>mentions</u> any racially discriminatory conduct by anyone at Molloy." (Def.'s Mem. at 16.) The Court agrees with Defendants. Plaintiff's letter completely lacked any reference or indication that Plaintiff opposed statutorily prohibited conduct. *See Palmer v. Penfield Cent. Sch. Dist.*, 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013) ("The question is simply whether [the plaintiff] opposed a practice that she reasonably believed violated Title VI.").

Similarly, the Court notes that the evidence in the record does not support a finding that Plaintiff objected to any discriminatory conduct on the part of the Defendants prior to bringing this action. Plaintiff's alleged statements to Parry that Vitale "looked at [her] in a suspicious manner" and that she felt that she was being treated "unjust[ly] and unfair[ly]" by Vitale and Muldoon do not constitute protected activity because there is no indication that Plaintiff believed she was opposing racially based discriminatory conduct. In fact, Plaintiff allegedly told Parry that she "felt [Vitale] was implying that [she] was not intelligent enough to write a paper like this." (Pl.'s Mem. at 16.) Such statements do not support a finding that Plaintiff was complaining about race-based discrimination.

Moreover, even assuming that Plaintiff established a *prima facie* case of retaliation, she has failed to submit any argument that Defendants' legitimate, non-discriminatory reasons were merely pretext for discrimination. *See Koumantaros*, 2007 WL 840115, at * 10 (stating that if the plaintiff states a prima facie case for retaliation, the burden shifts to the defendant to offer "a legitimate, non-retaliatory reason for the adverse action," and once the defendant has done so, the plaintiff can succeed on her retaliation claim "only if she can show that defendant's legitimate reason for the adverse action was in fact merely a pretext for retaliation"). Thus, the Court grants summary judgment in favor of Defendants on Plaintiff's Title VI retaliation claim.

IV.     ***Plaintiff Fails to Raise a Genuine Issue of Material Fact as to Her Claim of Intentional Racial Discrimination Under Section 1981***

A.      ***Governing Legal Principles***

Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction

of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981. To establish a claim under Section 1981, plaintiff must show: "1) plaintiff's membership in a racial minority; 2) discrimination based on one or more of the activities enumerated in [Section 1981]; and 3) an intent to discriminate on the basis of race by the defendant." *Tripp*, 48 F. Supp. 2d at 223; *see also Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 339 (2d Cir. 1999). Moreover, New York courts have held that an implied contract arises when a student enrolls at a college. *Tripp*, 48 F. Supp. 2d at 224. "A term of the implied contract between the [college] and plaintiff [is] presumably the right to complete her degree without being subjected to discriminatory conduct." *Id.*

### B. *Sufficiency of the Evidence*

Plaintiff has established a prima facie case for intentional discrimination under Section 1981. Plaintiff, an African-American woman, is a member of a racial minority. Additionally, Plaintiff has come forth with evidence in which a rational jury could find that Defendants unlawfully discriminated against Plaintiff on the basis of her race, i.e., that Defendants did not adhere to their requirements, policies and procedures for a similarly situated non-African American student, Bredes, but required adherence to its course requirements, policies and procedures in Plaintiff's case. This evidence, albeit only a single instance, would support a rational jury's finding that Defendants' conduct was discriminatory.

However, as with Plaintiff's Title VI claims, here, too, Plaintiff has failed to submit any argument that Defendants' legitimate, non-discriminatory explanations for their conduct were merely pretext for discrimination. *See Tripp*, 48 F. Supp. 2d at 225 (applying the

*McDonnell Douglas* burden shifting analysis to the plaintiff's Section 1981 claim).  Accordingly, Defendants' motion for summary judgment as to Plaintiff's Section 1981 claim is granted.

## V.    *Plaintiff's State Law Claims*

Having found that Plaintiff's Title VI and Section 1981 claims fail as a matter of law, there is no longer any independent basis for federal jurisdiction in the within action.  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL and breach of contract claims.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir.1998) ("[The Second Circuit] and the Supreme Court have held that when the federal claims are dismissed the 'state claims should be dismissed as well.'" (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966))).  "While discovery has been completed and the instant case has proceeded to the summary judgment stage, it does not appear that any discovery would need to be repeated if plaintiffs' pendent claims were brought in state court." *Tishman v. Associated Press*, 2007 WL 4145556, at *9 (S.D.N.Y. Nov. 19, 2007) (citation omitted) (declining to exercise supplemental jurisdiction over remaining state claims after summary judgment was granted to defendants on plaintiffs' federal claims).  Moreover, "'[s]ince [New York's CPLR § 205] allow[s] a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations,' [plaintiff] will not be unduly prejudiced by the dismissal of her state law claims." *Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 169 (S.D.N.Y. 2006) (alterations in original) (citations and quotation marks omitted).  Accordingly, Plaintiff's NYSHRL and breach of contract claims are dismissed without prejudice.

*CONCLUSION*

For all of the above reasons, Defendants' motion for summary judgment is GRANTED as to Plaintiff's Title VI and Section 1981 claims. Because the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, those claims are dismissed without prejudice. Upon entry of judgment, the Clerk is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
        October 16, 2013                       _____/s/_____
                                               Denis R. Hurley
                                               United States District Judge